UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:20-cv-00038-KDB
(5:16-cr-00065-KDB-DCK-1)

| | | |
|---|---|---|
| JOSEPH HOWARD DAVIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

**THIS MATTER** is before the Court on Petitioner's Pro Se Motion to Vacate, Set Aside

or Correct Sentence under 28 U.S.C. § 2255 [CV Doc. 1],[1] Petitioner's Pro Se "Motion Requesting

Mercy" [CV Doc. 3], the Government's Motion to Dismiss [CV Doc. 6], Petitioner's Pro Se

Motion for Discovery [CV Doc. 7], and Petitioner's "Motion to Amend Petitioner's 2255 & Breif

[*sic*] in Support of Petitioner's 2255" ("Motion to Amend") [CV Doc. 8].

## I.    BACKGROUND

### A.    Offense Conduct

In August 2016, law enforcement officers investigating methamphetamine trafficking in

Charlotte, North Carolina, identified Joseph Howard Davis ("Petitioner") as a suspect after

Roderick Roberts, who had earlier been incarcerated with Petitioner and to whom Petitioner had

---

[1] Citations to the record herein contain the relevant document number referenced preceded by either the letters "CV," denoting that the document is listed on the docket in the civil case file number 5:20-cv-00038-KDB, or the letters "CR," denoting that the document is listed on the docket in the criminal case file number 5:16-cr-00065-KDB-DCK-1.

sold methamphetamine, was arrested.[2] [CR Doc. 121 at 24, 28, 31-32, 137-38: Trial Tr.]. Roberts

and his girlfriend, Tangie Carroll, who also bought methamphetamine from Petitioner, agreed to

cooperate with investigators. [Id. at 31, 33, 121, 125-29, 131]. Carroll was already in custody for

facilitating large-scale methamphetamine transactions with her supplier, Reggie Shaw. [Id. at 31,

123, 131]. Petitioner met Shaw while both were in prison and sold methamphetamine to Carroll

and Roberts when Shaw was out of town. [Id. at 125-29, 138-39, 149]. Investigators conducted a

controlled purchase of methamphetamine from Shaw and seized 26 pounds of methamphetamine

from him. [Id. at 34-35, 148].

After Shaw was arrested and began cooperating with investigators, investigators learned

that S.M. was involved in the distribution of methamphetamine and heroin in the Catawba County

area of western North Carolina. [CR Doc. 121 at 36, 167]. S.M. reported that Petitioner was one

of her sources of supply. [Id. at 36-37, 81-82]. Because investigators had already identified

Petitioner as a suspect, they decided to "establish [S.M.'s] credibility" and then use her to make a

controlled purchase of methamphetamine from Petitioner. [Id. at 34, 37, 82].

Working with investigators, S.M. set up a controlled buy for two ounces of

methamphetamine, using a series of phone calls and text messages to two different cell phones

used by Petitioner. [Id. at 37, 86-88]. On September 28, 2016, S.M., accompanied by another

individual, met with Petitioner to conduct the transaction. [Id. at 37; CR Doc. 118 at ¶ 6:

Presentence Investigation Report (PSR)]. Investigators searched S.M. and her companion before

S.M. met with Petitioner and conducted "[c]onstant surveillance" throughout S.M.'s meeting with

Petitioner. [Id. at 37]. S.M. used official government funds to buy what was believed to be two

---

[2] The investigation, which began in 2012, was the product of the Organized Crime Drug Enforcement Task Force (OCDEF), which is a collaborative effort between federal, state, and local law enforcement resources to target high profile, large scale narcotic trafficking organizations. [CR Doc. 121 at 20, 24].

ounces of methamphetamine from Petitioner. [Id. at 37-38]. The substance was later learned to be rock salt, not a controlled substance. [Id. at 37, 82-83, 106].

Thereafter, S.M. sent Petitioner "a series of … text messages … complaining of [Petitioner's] ripping her off," and Petitioner agreed to "another transaction for two ounces" a couple weeks later. [Id. at 37-38, 83-84, 104]. On October 11, 2016, S.M. texted Petitioner, stating, "Hit me up ASAP. There's money to be made today." [Id. at 88]. S.M. and Petitioner then spoke on the phone regarding a price for the transaction. [Id. at 86, 93-94]. This phone call was recorded while S.M. and investigators, including Jeff Jenkins, an investigator in the Vice and Narcotics Unit in the Hickory Police Department and sworn Homeland Security Investigations task force officer, were at Jenkin's Hickory, North Carolina, office. [Id. at 49, 80-81, 93-94]. Soon after, more text messages were exchanged in which Petitioner and S.M. negotiated the price for two ounces of "clear," or crystal methamphetamine, and settling on a price of $1,750, Petitioner texted S.M. to "meet at the mailbox." [Id. at 90-92]. Petitioner responded that he was bringing "good shit."[3] [Id. at 93]. William Greene, S.M.'s boyfriend, drove S.M. and Duane Barnes,[4] acting undercover, in Green's truck to the apartment complex where Petitioner lived, meeting Petitioner there. [Id. at 38, 84-85, 112-13, 170]. S.M. got into Petitioner's car and, after talking with Petitioner for a few minutes, returned to the truck and turned over almost 54 grams of nearly pure methamphetamine to Barnes. [Id. at 40, 57-58, 75-76, 85, 113-15]. During the transaction in the

---

[3] Jenkins, who was sitting beside S.M. during the transmission of these text messages except for the drive from the Hickory office to Charlotte to conduct the controlled buy, took digital photographs of these messages as they were displayed on S.M.'s phone. In taking these photographs, Jenkins was careful to include the continuous string of messages by including the words depicted at the bottom of one photograph at the top of the next photograph. [CR Doc. 121 at 86-87, 90].

[4] Barnes is a narcotics detective with the Alexander County Sheriff's Office and a Homeland Security Investigations task force officer. [CR Doc. 121 at 112].

3

truck, Barnes witnessed Petitioner hold up the bag of methamphetamine and what appeared to be placing the drugs on a scale in his vehicle. [Id. at 113-15].

Eight days after Petitioner's transaction with S.M., law enforcement officers searched Petitioner's apartment pursuant to a search warrant. [CR Doc. 121 at 43]. Investigators, including Homeland Security Special Agent Joe Barringer, encountered Petitioner at a storage facility near Petitioner's residence before the search was conducted. [Id. at 19, 43-44]. Petitioner agreed to cooperate after learning of the investigation. [Id.]. Petitioner told investigators that he had two .22 caliber rifles in his apartment and some drug paraphernalia. [Id. at 44, 47]. Petitioner walked with investigators into his bedroom and bathroom, where the investigators found the two rifles, used and unused needles, and digital scales. [Id. at 44, 46]. After the search of Petitioner's apartment, Petitioner, in his own vehicle, followed investigators to Barringer's office for an interview. [Id. at 48-49].

Barringer and other task force officers conducted the interview. Petitioner reported that he was incarcerated from 2007 to 2014 on a conviction for heroin trafficking. [Doc. 80-1 at 2]. During the interview, Petitioner reported that he became close friends with Shaw while the two were incarcerated together. [Id. at 2]. Petitioner also reported that Roberts was incarcerated with him but that they were not friends. [Doc. 121 at 51; Doc. 80-1 at 2]. Petitioner told investigators that, after he was released from prison, he needed extra money, so he began buying small amounts of methamphetamine from Shaw to sell. [Id. at 177-78]. Shortly thereafter, and at Shaw's request, Petitioner began filling Shaw's customers' orders while Shaw was out of town, which occurred about once a month. [Id. at 53, 80]. On at least two occasions when Shaw was out of town and on Shaw's direction, Petitioner sold Carroll between 15 and 16 ounces of methamphetamine. [Id. at 53, 55]. After Carroll was arrested and while Roberts was out of town, Petitioner met with Shaw

4

and sold him methamphetamine on Shaw's behalf.  [Id. at 56].  Petitioner told investigators that he did not know the exact amounts he was supplying to Shaw's customers because Shaw prepackaged the drugs.  [Id. at 55; Doc. 80-1 at 3].

Initially, Petitioner denied having sold methamphetamine to S.M.  [CR Doc. 121 at 52].  When investigators told Petitioner that they had used S.M. to buy two ounces of methamphetamine from Petitioner on two occasions, Petitioner acknowledged that he sold S.M. two ounces of rock salt on the first occasion and that he got the two ounces of real methamphetamine in the second transaction from someone Petitioner knew as "Slim."  [Id. at 56-57; Doc. 80-1 at 4].  When asked about the rifles, Petitioner told investigators that Greene gave him the rifles in exchange for a drug debt because Petitioner sold to Greene when Greene did not have any cash.  [Id. at 56; Doc. 80-1 at 3; see also Doc. 121 at 164-65, 171-72].

**B.      Criminal Proceedings**

On April 18, 2017, Petitioner was charged in a Superseding Bill of Indictment with one count of methamphetamine trafficking conspiracy in violation of 21 U.S.C. §§ 841(a)(1) and 846, with 50 grams of actual methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine foreseeable to Petitioner under 21 U.S.C. § 841(b)(1)(A) (Count One); one count of possession of a firearm in furtherance of drug trafficking, as charged in Count One, in violation of 18 U.S.C. § 924(c) (Count Two); one count of distribution of and possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, involving 50 grams or more of actual methamphetamine foreseeable to Petitioner under 21 U.S.C. § 841(b)(1)(A) (Count Three); and one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) (Count Four).  [CR Doc. 58: Superseding Indictment].  The Government filed an Information in accordance with 21 U.S.C. § 851, notifying

Petitioner that it intended to seek enhanced penalty for Petitioner's drug trafficking offense because Petitioner had previously been convicted of a felony drug offense. [CR Doc. 25]. The Court appointed attorney Emily Jones from the Federal Public Defender's Office to represent Petitioner. [10/28/2016 Docket Entry].

A month later, Jones filed a motion for inquiry of counsel, citing Petitioner's request for new counsel and a breakdown in communication. [CR Doc. 23]. During the hearing on this motion, Jones noted that she and Petitioner "see the evidence against him in a different way" and had "significantly different perceptions of the law that applies to his case." [CR Doc. 142 at 5: Hearing Tr.]. Petitioner stated that he been offered a plea, but that he "refused to take" it because he wanted to pursue his case. [Id. at 6]. The Court advised Petitioner that his "difficult circumstances" would remain despite a change in counsel but granted the motion for new counsel. [Id. at 10-11].

S. Frederick Winiker, III, was then appointed to represent Petitioner. [12/5/2016 Docket Entry]. By the end of January 2017, Winiker filed a motion for inquiry of counsel. [CR Doc. 36]. Winiker noted that Petitioner had expressed an interest in proceeding pro se and had filed several pro se motions. [Id. at 1]. Winiker also noted that the Government had extended a plea offer that would soon expire. [Id.]. The Court held a hearing the next day. [CR Doc. 144: Hearing Tr.]. Petitioner told the Court that he was satisfied to have Winiker continue to represent him. The Court, therefore, took no action on the motion. [Id. at 3].

Two months later, Winiker filed a motion to withdraw, citing the fact that Petitioner had filed a grievance against him with the Mecklenburg County Bar. [CR Doc. 45]. At the hearing, which was held at the end of March 2017, the Court noted its frustration with the situation, stating, "I don't want criminal defendants to be able to kick their lawyers out of cases by filing bar

complaints against, particularly lawyers as good as you." [CR Doc. 51 at 5-6: Hearing Tr.]. Petitioner stated that he believed Winiker was a good attorney but admitted that he filed a bar complaint against him, as well as against his first attorney, Jones. [Id. at 9]. Petitioner stated that Winiker "wants me to take the plea. I don't want to take the plea." [Id. at 15]. The Court advised Petitioner that, even if it were to appoint a third lawyer in his case, "the [May] trial date remains the same." [Id. at 15]. Petitioner acknowledged that he understood this and wanted the Court to appoint new counsel. [Id. at 15-16]. Reluctantly, the Court granted the motion to withdraw, advising Petitioner, "we're not going to let you run through every lawyer in the bar." [Id. at 16-17].

On March 31, 2017, the Court appointed Haakon Thorsen to represent Petitioner. [3/31/2017 Docket Entry]. Despite its previous admonition, the Court continued the case once after Thorsen was appointed. [CR Doc. 49]. The two-day trial began on July 24, 2017. [See Doc. 71]. Before trial, Petitioner moved to suppress the statements he made to investigating officers. [CR Doc. 79]. The Court denied this motion after a hearing on the matter. [CR Doc. 120 at 26: Hearing Tr.]. The Court also denied Petitioner's motion in limine seeking to exclude pictures of Petitioner's text messages with S.M. facilitating the drug transactions. [CR Doc. 85; CR Doc. 120 at 29-30].

The case proceeded to trial before the Honorable Richard L. Voorhees. Before trial, Petitioner stipulated that the controlled substance seized from S.M. on October 11, 2016, was 53.88 grams of nearly pure methamphetamine. [CR Doc. 82: Stipulation; see also Doc. 121 at 40-41]. Petitioner also stipulated that he was a convicted felon and that the rifles seized from his apartment traveled in and affected interstate commerce. [CR Doc. 82].

In his opening statement, Petitioner argued that the case was based on confidential informants who were "trying to throw Joseph Davis under the bus" to help themselves. Petitioner claimed that he was performing home maintenance, not dealing drugs. Petitioner further noted that he was "not trying to hide facts" and had stipulated to the drugs S.M. allegedly sold to Petitioner, pointing out that she would not be testifying at trial. [CR Doc. 121 at 15-16]. Petitioner claimed that S.M. was trying to fool the United States by pulling off a fake drug deal and keeping the money. [Id. at 17]. Petitioner claimed, rather, that, during the second drug transaction, S.M. did not get the methamphetamine from Petitioner and that no methamphetamine was found at his house. [Id. at 17-18].

The Government presented evidence from several law enforcement officers, as well as Shaw, Carroll, Roberts, and Greene. Barringer testified regarding working with confidential informants (CIs), controlled buys, the investigation, including the two transactions and the search of Petitioner's apartment, as well as Petitioner's interview. [CR Doc. 121 at 21-24, 27-58]. By way of background, Barringer testified that the veracity of CIs is tested through a variety of ways. After their truthfulness has been corroborated, they are asked to interact with and conduct controlled purchases of drugs from individuals they have known for long periods and with which they have "instant credibility." [Id. at 21-22]. The controlled purchases are typically set up through "a volley of telephone calls or meetings." [Id. at 22]. Before the CI is "is ever put in motion to go conduct a transaction, a thorough search of their person, whatever [vehicle] they're taking to and from the deal, is searched to insure that there is no contraband of any kind with them." [Id.]. These searches are done to ensure that they have no drugs or funds in their possession before meeting the person they are alleging to be their source of supply, other than the government funds they are provided with to conduct the transaction. [Id. at 22-23]. Then, after the transaction

8

occurs, law enforcement "conduct[s] another search … to make sure what was advertised is actually what occurred." [Id. at 23]. The controlled buys between S.M. and Petitioner occurred in accordance with these procedures. [See id. at 36-37, 85].

Jenkins also testified regarding the controlled buys between S.M. and Petitioner, including the text messages and phone calls setting up the buys. [CR Doc. 121 at 80-96, 104]. In particular, on cross examination, Jenkins testified "from her text messages it seems" that "[S.M.] had ripped off Homeland Security." [Id. at 107]. He further testified that S.M. "stated … that she just wants something cooked up to supply her people with and that she doesn't care what it is." [Id.]. Thereafter, Thorsen requested a sidebar, advising the Court that "I just realized I'm not sure I ever saw those text messages, if they were ever given to me in discovery" and "I wanted to ask Investigator Jenkins about those messages but, also, to ascertain whether or not they were given to me by the government." [Id. at 109]. The prosecutor advised the Court he was "confident" he had emailed all the text messages to Thorsen. [Id.]. Jenkins returned to the stand and, on re-cross examination by Thorsen, clarified that he was "mistaken" in his testimony about text messages from S.M. wanting "something cooked up" by Petitioner. Jenkins testified that "I knew that I had seen that in writing, but it was actually written in Special Agent Barringer's debrief of [Petitioner]. He said that that's what [S.M.] told him. I did not see that in a text message. I made a mistake." [Id. at 111].

Barnes testified regarding his role in the controlled buy, including having been present with S.M. when she met with Petitioner for the October 2016 transaction, that he saw Petitioner hand S.M. a bag containing what appeared to be methamphetamine, and that S.M. returned to the vehicle with a bag of crystal methamphetamine. [Id. at 112-17].

9

Shaw testified that he and Petitioner were trafficking methamphetamine and that he gave Petitioner two to four ounces of methamphetamine a day for Petitioner's customers. [Id. at 148-54]. Carroll testified that when Shaw was out of town, Petitioner would sell methamphetamine on Shaw's behalf. [Id. at 121-30]. Roberts testified that Petitioner sold him 16 ounces of methamphetamine on two occasions, the transactions occurring at Shaw's apartment. [Id. at 137-41]. Greene testified that he bought heroin and methamphetamine from Petitioner; that he drove S.M. and an undercover officer to meet Petitioner on October 11, 2016; and that once when he did not have cash for drugs, he gave Petitioner two rifles, one as payment for drugs and the other as a gift. [Id. at 162-66].

At the close of the Government's evidence, Petitioner moved for a judgment of acquittal. [CR Doc. 121 at 173]. Thorsen also stated, "Your honor, I'm not sure, to preserve any evidentiary arguments that the defendant may have, if I should also make a motion for a mistrial. I can't remember my criminal procedure at this point, but I would make a motion for mistrial as well." [Id. at 174]. The Court denied the motions. [Id. at 173-75].

Petitioner then testified on his own behalf. Petitioner testified that he met Shaw when they were incarcerated together and, when Petitioner was released from prison, he performed plumbing and other home maintenance work for Shaw. [CR Doc. 125 at 28-30: Trial Tr.]. He denied that he had bought and sold methamphetamine and denied admitting to Barringer that he had done so. [Id. at 30, 36-37]. Petitioner admitted that he occasionally text S.M. and that he sold her flex on one occasion but denied the text messages Jenkins testified to related to drugs. [Id. at 32, 40-41, 43-44]. Petitioner testified that he "[didn't] know" whether he met with S.M. on October 11, 2016. [Id. at 43]. Petitioner also denied making the statements following the search that Barringer testified to and denied that the voice on the recording with S.M. belonged to him. [Id. at 36-39,

10

45-46, 51-55, 57-58].  Petitioner, however, admitted possessing the two firearms.  [CR Doc. 125 at 45].

The jury acquitted Petitioner of the drug trafficking conspiracy offense and of possessing a firearm in furtherance of that offense.  [CR Doc. 88: Jury Verdict].  The jury, however, found Petitioner guilty of distributing and possessing with intent to distribute methamphetamine on October 11, 2016, and that the offense involved 50 grams or more of actual methamphetamine. [Id.].  The jury also convicted Petitioner of being a felon in possession of a firearm.  [Id.].

Petitioner was sentenced on February 7, 2018.  Before his sentencing, a probation officer prepared a PSR.  [CR Doc. 118].  The probation officer found that 4.5 kilograms or more of methamphetamine were reasonably foreseeable to Petitioner, resulting in a base offense level of 38, U.S.S.G. §2D1.1(a)(5).  [Id. at ¶ 20].  The probation officer also recommended a two-level increase for possession of a firearm in connection with his drug-trafficking offense, U.S.S.G. §2D1.1(b)(1), and a two-level increase for obstructing justice by testifying falsely that he did not sell methamphetamine, U.S.S.G. § 3C1.1.  [Id. at ¶¶ 21, 24].  This yielded a Total Offense Level (TOL) of 42.  A TOL of 42 and a Criminal History Category of V yielded a guidelines range of 360 months to life in prison.  [Id. at ¶¶ 36, 62, 82].  Petitioner's drug-trafficking offense carried a statutory minimum term of imprisonment of 20 years and his felon-in-possession offense carried a maximum term of 10 years.  [Id. at ¶ 81].

Before sentencing, Thorsen filed a motion to withdraw as counsel after Petitioner filed a bar disciplinary grievance against him.  [CR Doc. 107].  The Court denied Thorsen's motion to withdraw after a hearing.  [CR Doc. 124].  Thereafter, Petitioner filed objections to the PSR.  [CR Doc. 126].  Petitioner objected to the drug quantity calculation, arguing that the Court should not rely on Shaw's or Carroll's testimony about Petitioner's drug-trafficking activities because the jury

found Petitioner not guilty of methamphetamine trafficking conspiracy. [Id. at ¶¶ 5-6]. Additionally, Petitioner requested a downward variance, arguing that "any sentence in excess of 20 years would not serve the purposes of sentencing and would lead to unwarranted disparities." [Id. at ¶ 16].

At the beginning of the sentencing hearing, Petitioner told the Court, "I'm not satisfied at all with my counsel." [CR Doc. 138 at 2: Sentencing Tr.]. The Government addressed the Court on the issue, noting that

> [E]ven during trial it seemed like he was trying to manipulate the system just to, as he may think, to set up a 2255 motion. And he was even – I believe it was even after the government had closed its evidence that … he said he wanted to fire Mr. Thorsen and then changed his mind and said he wanted to continue to work with Mr. Thorsen. So this is just part of a lengthy practice of apparent systematic manipulation.

[Id. at 3]. The Court concluded that, "given the record of the case and the matters before the Court, … we're in a posture to proceed with Mr. Thorsen," giving Petitioner "such latitude as he would like … to present matters of interest to him." [Id.]. Petitioner argued in accordance with his PSR objections. [Id. at 9]. Petitioner again denied admitting to officers that he sold methamphetamine and claimed that his testimony at trial was truthful. [Id.]. Petitioner challenged one of his criminal history points, and he argued that the Court should vary downward to the statutory mandatory minimum sentence to avoid unwarranted disparities with the other defendants and because Petitioner had a strong work history, had skills to support himself, and had the support of the community. [Id. at 10-11, 13-14].

The Court overruled Petitioner's drug quantity objection, explaining that it had "heard the evidence" and that Petitioner's objections to the facts summarized in the PSR were not "supported by the evidence at trial." [CR Doc. 138 at 11-12]. The Court held the obstruction of justice offense

level increase was proper, citing the "strength of the evidence against [Petitioner]." [Id. at 12]. The Court varied downward, sentencing Petitioner to a term of imprisonment of 260 months for the drug trafficking offense and a term of 120 months for the felon-in-possession offense, finding such sentence sufficient but not greater than necessary to accomplish the purposes of 18 U.S.C. § 3553(a). [Id. at 23]. The Court noted that the offense conduct was consistent with a previous pattern of conduct by Petitioner and that the evidence resulting in Petitioner's conviction "stood on its own two feet." [Id. at 21]. The Court also noted that most of Petitioner's drug trafficking associates "cooperated and testified in his trial and did so convincingly." [Id. at 22].

### C.    Petitioner's Appeal

Petitioner appealed his conviction and sentence to the Court of Appeals for the Fourth Circuit. [CR Doc. 94: Notice of Appeal]. He argued that this Court erred in admitting an out-of-court statement made by S.M. and the photographs of S.M.'s cellphone screen, as well as the recording of the phone conversation between S.M. and Petitioner based on an officer's identification of Petitioner's voice. United States v. Davis, 918 F.3d 397, 399 (4th Cir.), cert. denied, 140 S. Ct. 202 (2019). Petitioner also argued that this Court erred in using coconspirator testimony to determine the drug quantities for sentencing, despite the jury's acquittal of Petitioner on the conspiracy count. Id. The Fourth Circuit rejected the evidentiary challenges. Id. at 401-04. The Fourth Circuit also held that Petitioner's contention that "a court may not consider acquitted conduct in establishing drug amounts" was "not the law." Id. at 405. The court noted that a lower standard, preponderance of the evidence, applies at sentencing and that a finding as to drug quantity was not necessary to the jury's verdict of acquittal. Id.

### D. Petitioner's Motion to Vacate and Motion to Amend

On March 24, 2020, Petitioner filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence. [CV Doc. 1]. Petitioner asserts the following grounds for post-conviction relief: (1) the Government violated Brady[5] by withholding text messages from S.M. that "would have been considered material" and would have shown that S.M. was not reliable and, therefore, "put[ ] holes in the Government theory;" (2) prosecutorial misconduct in that:

> The attorney for the government violated the [Petitioner's] right to Due process by failing to produce informant, falsifying documents, letting officers and government witnesses knowingly testify falsly, surpressed important Giglio[6] & Brady materials, violated Stipulation agreement misrepresented facts of drug amounts informant participation, informant misconduct, along with understating the perticipation of key government witnesses and their involvement to the Jury and Sentencing Judge;

(3) the trial court violated Petitioner's due process by failing to inquire on the competency of Petitioner's trial counsel where counsel stated during the trial that he "[didn't] know [his] Federal Rules of Criminal Procedure at this point" and because it "failed to address the Jury of erras in the indictment;" and (4) he received ineffective assistance of counsel based on effectively a laundry

---

[5] In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S. Ct. 1194 (1963). "Therefore, a Brady violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." Nicolas v. Attorney Gen. of Md., 820 F.3d 124, 129 (4th Cir. 2016). "Both information that undermines the prosecution's case and information that supports the defendant's case constitute Brady material that must be disclosed." Id.

[6] In Giglio, the Supreme Court held that "[i]mpeachment evidence, as well exculpatory evidence, falls within the Brady rule." United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985) (citing Giglio v. United States, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972)). "In Giglio v. United States, … the Government failed to disclose impeachment evidence similar to the evidence at issue in the present case, that is, a promise made to the key Government witness that he would not be prosecuted if he testified for the Government." Id. at 676-77, 92 S. Ct. at 3380-81.

list of claims. [CV Doc. 1 at 4-5, 7-9 (errors uncorrected)]. The Court ordered the Government to respond to Petitioner's § 2255 motion. [CV Doc. 2].

Before the Government responded, Petitioner filed a "Motion Requesting Mercy," in which Petitioner asks the Court "to have less stringent standards" relative to Petitioner's § 2255 motion and "to provide [him] with any help they can" … "to compleat [*sic*] the 2255 matters." [CV Doc. 3]. The Government timely moved to dismiss Petitioner's § 2255 motion. [CV Doc. 6]. The Government argues that Petitioner's claims of ineffective assistance of counsel are conclusory and without merit and that his claims of prosecutorial misconduct and the denial of due process are procedurally barred and without merit. [Id. at 1].

Petitioner then filed a motion requesting discovery, moving the Court to "make available from the government the discovery packet from Case No. 5:16-cr-00065 which includes trial exhibits, Brady, Giglio, and Jencks[7] material." [CV Doc. 7 at 1]. Petitioner claims that "[d]uring officer Jenkins testimony [Petitioner] learned of Brady material witch [*sic*] was never turned over by the Government," which consisted of "text messages which show the government informant [S.M.] setting up fake drug deals so she can rip off homeland [*sic*] Security officers." [Id. at 2]. Petitioner requests a hearing on this motion. [Id. at 5].

Then, on July 6, 2020, less than a year from the Supreme Court's October 7, 2019 denial of Petitioner's petition for writ of certiorari, Petitioner filed a 73-page motion to amend his § 2255 motion. [CV Doc. 8]. In his motion to amend, Petitioner purports to assert some additional grounds for relief, including additional claims of ineffective assistance of counsel at trial and at sentencing,

---

[7] Under the Jencks Act, 18 U.S.C. § 3500, "in a federal criminal prosecution, after a witness called by the United States has testified on direct examination, the court, on motion of the defendant, shall order the United States to produce any 'statement' as defined in the Act, in the possession of the United States that relates to the subject matter as to which the witness has testified." Goldberg v. United States, 425 U.S. 94, 96-97, 96 S. Ct. 1338, 1342-43 (1976) (citing 18 U.S.C. § 3500).

prosecutorial misconduct, as well as claims, for the first time, of ineffective assistance of appellate counsel, which are, in substance, claims of error by the Fourth Circuit in deciding Petitioner's appeal. [See id.]. Petitioner also appears to take issue with the Fourth Circuit's ruling on his evidentiary claim that the trial court improperly admitted certain hearsay evidence. [Id. at 70-71].

This matter is now ripe for adjudication.

## II.    STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III.    DISCUSSION

### A.    Petitioner's Motion to Amend

The amendment of § 2255 pleadings is governed by Rule 15 of the Federal Rules of Civil Procedure. See United States v. Pittman, 209 F.3d 314, 317 (4th Cir. 2000). Rule 15(a) provides that a party may amend his pleading once as a matter of course within 21 days of service, or within 21 days after service of a responsive pleading. Fed. R. Civ. P. 15(a)(1)(A) and (B). Otherwise, a party seeking leave to amend must obtain leave of court. Fed. R. Civ. P. 15(a)(2). Under Rule 15(a), leave should be freely given when justice requires. Id.

Petitioner's judgment of conviction became final on October 7, 2019, when the Supreme Court denied his petition for writ of certiorari, Davis v. United States, 140 S. Ct. 202 (2019). See United States v. Segers, 271 F.3d 181, 186 (4th Cir. 2001) ("[T]he judgment of conviction of a

prisoner who has petitioned for certiorari becomes final for purposes of the one-year period of limitation in § 2255 ¶ 6(1) when the Supreme Court denies certiorari after a prisoner's direct appeal"). Petitioner timely filed his original motion to vacate of March 24, 2020. [CV Doc. 1]. Before the Government responded to Petitioner's motion, Petitioner moved for additional time to reply to the Government's response, which the Court granted. [CV Docs. 4, 5]. On May 28, 2020, the Government timely moved to dismiss Petitioner's motion to vacate. [CV Doc. 6]. Petitioner never responded to this motion, but instead moved for discovery and, then on July 6, 2020, moved to amend his motion to vacate. [CV Docs. 7, 8].

As such, because Petitioner did not move to amend until more than 21 days after the Government responded, the Court is to grant his motion to amend "when justice so requires." See Fed. R. Civ. P. 15(a)(2). In his 73-page motion to amend (and "brief"), Petitioner largely presents additional argument in support of previously asserted grounds for relief, rather than asserting new grounds for relief. [See Doc. 8]. Nonetheless, to the extent Petitioner asserts new claims for relief, the Court will deny Petitioner's motion to amend as futile. See Equal Rights Ctr. v. Niles Bolton Assocs., 602 F.3d 597, 603 (4th Cir. 2010) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). The Court has reviewed each of Petitioner's additional claims and finds them to be barred and/or without merit.

### B.  Ineffective Assistance of Counsel

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI.  To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a

strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). To establish prejudice, the petitioner must demonstrate there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. It is not sufficient to show the mere "'possibility of prejudice.'" Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1994) (quoting Murray v. Carrier, 477 U.S. 478, 494 (1986)). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

When the ineffective assistance claim relates to a sentencing issue, the petitioner must demonstrate a "'reasonable probability' that his sentence would have been more lenient" but for counsel's error. Royal v. Taylor, 188 F.3d 239, 249 (4th Ci1r. 1999) (quoting Strickland, 466 U.S. at 694)). If the petitioner fails to meet this burden, the "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

Here, Petitioner contends his attorney provided ineffective assistance by failing to (1) be prepared for trial; (2) review discovery; (3) investigate a plausible defense; (4) challenge the

18

indictment, the informant, and the drug seizures; (5) hire a private investigator; (6) present an alibi witness; (7) request <u>Brady</u> and Jencks material; (8) supply an accurate plea; (9) explain the risks of going to trial, including "enhanced sentences based on taking the stand;" (10) explain the penalties of signing a stipulation; (11) explain relevant conduct; and (12) challenge the § 851 enhancement. [CV Doc. 1 at 8-9]. Petitioner also contends that his counsel was ineffective because "[d]uring trial he admitted he didn't know 'Rules of Crim. proceed [*sic*] at this point;" did not make objections; failed to prepare Petitioner to testify; and failed to move to dismiss or to address <u>Brady</u> violations. [<u>Id.</u> at 9]. As stated in his original motion, Petitioner alleges no facts in support of these claims, <u>see</u> <u>United States v. Dyess</u>, 730 F.3d 354, 359-60 (4th Cir. 2013), and fails to explain how these alleged deficiencies prejudiced him. Although he provides some additional detail in his motion to amend as to some of these claims, they are meritless, nonetheless. The Court will address each of Petitioner's claims of ineffective assistance in turn.

### 1. Plea Agreement

Petitioner claims that Thorsen was ineffective for failing to supply Petitioner with an "accuret" plea. [CV Doc. 1 at 8]. Counsel, however, is not ineffective for failing to obtain a plea offer that a defendant is willing to accept. <u>Cf.</u> <u>Weatherford v. Bursey</u>, 429 U.S. 545, 561 (1977) (recognizing "there is not constitutional right to plea bargain"). Here, Petitioner has made clear that he did not want to take a plea deal [CR Docs. 142 at 6; CR Doc. 51 at 15], and that he was ready to proceed with his case [CR Doc. 51 at 15]. Petitioner, in any event, was without leverage for a favorable plea bargain seeing as the Government effected controlled buys with Petitioner and given Petitioner's admissions to law enforcement. Petitioner has failed to show deficient performance or prejudice on this claim.

### 2. Preparation for and Competency During Trial

Petitioner claims Thorsen was unprepared for trial because Thorsen "filed pre-trial documents stating that he wasn't ready for trial." [CV Doc. 1 at 8]. Petitioner's claim is not well taken. Thorsen was Petitioner's third attorney, appointed only a month before Petitioner's trial date. Thorsen's motion to continue the trial date was for Petitioner's benefit and evinced an effort to be more, not less, prepared for trial. Petitioner has failed to show deficient performance on this claim or prejudice, and it will be dismissed.

Petitioner also claims that Thorsen's comment at the close of the Government's evidence regarding forgetting his Rules of Criminal Procedure "at this point" constitutes in effective assistance of counsel. [CV Doc. 1 at 9; see CR. Doc. 121 at 174-75]. It does not. Thorsen's comment was in the context of ensuring that he preserve evidentiary objections at trial. [See CV Doc. 121 at 174-75]. Thorsen is an experienced criminal defense attorney who had met this Court's requirements for appointment to the Criminal Justice Act (CJA) panel. Furthermore, counsel preserved his objections for review, in any event, and Petitioner does not identify objections that counsel failed to make or how he was prejudiced by any failure to object.

### 3. Risk of Trial, Stipulation as to Drug Quantity, and § 851 Enhancement

Petitioner claims that his attorney "failed to explain dangers of going to trial including enhanced sentences based on taking the stand, failed to adequately explain the penaltys [*sic*] of signing a stipulation agreement and enhanced drug amount that should have been found by a jury." [CV Doc. 1 at 8]. These arguments are, again, not well taken. Petitioner makes no showing that proceeding to trial, testifying on his own behalf, or entering the stipulation agreement as to the quantity of drugs obtained during the October 11 transaction somehow increased the drug quantity. The stipulation agreed to by Petitioner stated only that the substance obtained by law enforcement

on October 11, 2016, was tested by a forensic chemist and found to be 53.88 grams of 96% pure methamphetamine. [CR Doc. 82]. The stipulation specifically provided that Petitioner did not agree that he had distributed, possessed, or conspired to possess methamphetamine, but "[m]erely agreed that the laboratory tests prove that the materials seized are methamphetamine." [Id.].

The stipulation was consistent with Petitioner's defense that he was not involved in the transaction in which S.M. obtained this methamphetamine and the stipulation evinced sound trial strategy. Further, Petitioner offers no basis on which he could have challenged the quantity or purity of the drugs. Finally, Petitioner fails to present any basis for challenging his predicate conviction under § 851.

As such, Petitioner's claims on these grounds also fail and will be dismissed.

### 4. Failure to Request **Brady** and Jencks Material

Petitioner asserts that Thorsen failed to request "Jenkins & Brady material." [CV Doc. 1 at 9]. This claim is without merit. Pursuant to the Court's Standard Criminal Discovery Order, the Government affirmatively provides such material to defense counsel. [See 12/12/2016 Docket Entry]. As such, Thorsen had no affirmative duty to request materials that the Court had already ordered be provided to him. Thorsen's conduct, therefore, was within the wide range of reasonable professional assistance. See Strickland, 466 U.S. at 687-88. Furthermore, other than unsubstantiated assertions, Petitioner fails to show how he was prejudiced by this alleged failure.[8] This claim, therefore, will be dismissed.

---

[8] In Petitioner's motion to amend, he spends considerable time elaborating on and attempting to support his claims of alleged Government Brady violations and manipulation of evidence of the text messages exchanged between himself and S.M. [CR Doc. 8 at 25-43]. These claims are without merit and unsupported by a plain reading of the record in this matter. The Court addresses them in the context of Petitioner's prosecutorial misconduct claim, below.

21

### 5. Petitioner's Other Challenges Related to Trial

Petitioner's claim that Thorsen failed to review discovery is belied by his performance at trial where he evidenced substantial familiarity with the evidence in the case. Furthermore, Petitioner does not identify what discovery he claims his attorney failed to review or how he was prejudiced thereby. As to Petitioner's claim that Thorsen failed to investigate a plausible defense, Petitioner does not identify what defense should have been presented at trial, nor how this prejudiced him. See Beaver v. Thompson, 93 F.3d 1186, 1195 (4th Cir. 1996) (holding that to support an ineffective assistance claim based on the failure to investigate, a petitioner must present specific information to show what favorable evidence the investigation would have produced); Savino v. Murray, 82 F.3d 593, 599 (4th Cir. 1996) (if there is "no reasonable probability that a possible defense would have succeeded at trial," counsel's failure to investigate such a defense is not prejudicial).

Further, Petitioner identifies no basis for challenging the Indictment, the informant, or the drug seizures. And, although Petitioner contends that Thorsen should have called "Ryan Glysheem" as an alibi witness, Petitioner does not explain who Glysheem is and makes no proffer of whether or what Glysheem would have testified to, nor how Petitioner was prejudiced where he was convicted only of the firearms offense to which he admitted and the methamphetamine sale law enforcement observed as part of the controlled buy. See Bassette v. Thompson, 915 F.2d 932, 940-41 (4th Cir. 1990).

Accordingly, because Petitioner has failed to show deficient performance or prejudice, these claims also fail and will be dismissed.

### 6. Sentencing

Again, when an ineffective assistance claim relates to a sentencing issue, the petitioner must demonstrate a "'reasonable probability' that his sentence would have been more lenient" but for counsel's error. Royal v. Taylor, 188 F.3d 239, 249 (4th Cir. 1999) (quoting Strickland, 466 U.S. at 694)). Petitioner's claims relative to sentencing are also meritless.

Petitioner claims that Thorsen failed to file objections to the PSR is plainly contradicted by the record. [See CR Doc. 126]. Prior to sentencing, Thorsen moved to withdraw as Petitioner's counsel because Petitioner had filed a bar disciplinary grievance against him. [CR Doc. 107]. After the Court denied Thorsen's motion to withdraw, he timely filed objections to the PSR. [CR Docs. 124, 126]. Petitioner also argues that Thorsen failed to address the "improper drug amounts" on the jury verdict form and allowed Petitioner to be sentenced based on a quantity of drugs higher than that alleged in the indictment. [CV Doc. 1 at 9]. This claim is meritless. The Superseding Indictment alleged that Petitioner's offense involved "fifty (50) grams **or more** of methamphetamine (actual)." [CV Doc. 58 at 2 (emphasis added)]. The drug quantity, therefore, was not limited to 50 grams of methamphetamine and the jury specifically found that the amount of actual methamphetamine attributable to Petitioner was "50 grams or more." [CR Doc. 88 at 5].

Additionally, counsel objected to the PSR based on Petitioner's disagreement with the drug amount, including his contention that Shaw's and Carroll's testimony was not credible. [CR Doc. 126 at 1-2]. As the Fourth Circuit held on appeal, however, that this Court properly determined that Petitioner's relevant conduct included the drug quantities identified by Shaw and Carroll. Davis, 918 F.3d at 405-06. Counsel's performance is not insufficient merely because objections lodged are not sustained by the Court. See Bell v. Evatt, 72 F.3d 421, 429 (4th Cir. 1995) (holding reasonable, though unsuccessful, trial tactics do not establish ineffective assistance). Petitioner

also fails to show prejudice, particularly where Petitioner achieved a 100-month downward variance sentence after his counsel's arguments at sentencing.  See Strickland, 466 U.S. at 687-88, 694.

In sum, Petitioner has failed to show deficient performance or prejudice and his claims for ineffective assistance of counsel will be dismissed.  See Strickland v. Washington, 466 U.S. 668, 687-88.

### C. Prosecutorial Misconduct

Petitioner asserts numerous claims of prosecutorial misconduct, including violating Brady and Giglio by withholding evidence of text messages, failing to produce S.M., falsifying documents, knowingly presenting false testimony at trial, violating the stipulation agreement, misrepresenting facts about the drug amounts and S.M.'s participation and misconduct, and understating the participation of key government witnesses.  [CV Doc. 1 at 5].

### 1. Procedural Default

A § 2255 motion is not a substitute for a direct appeal.  See Bousley, 523 U.S. at 621-22; Sunal v. Large, 332 U.S. 174, 178-79, 67 S. Ct. 1588 (1947).  Claims of error that could have been raised on direct appeal, but were not, are procedurally barred unless the petitioner shows both cause for the default and actual prejudice or demonstrates that he is actually innocent of the offense.  Bousley, 523 U.S. at 621-22; United States v. Bowman, 267 Fed. App'x 296, 299 (4th Cir. 2008).  "[C]ause for a procedural default must turn on something external to the defense, such as the novelty of the claim or a denial of effective assistance of counsel."  United States v. Mikalajunas, 186 F.3d 490, 493 (4th Cir. 1999).

Here, Petitioner did not raise any claim of prosecutorial misconduct at trial or on direct appeal.  In his § 2255 motion, Petitioner states that he "was told by [his] appeals attorney the 2255

is the only platform to raise these issues." [CV Doc. 1 at 6]. Petitioner, however, did not raise a claim of ineffective assistance of appellate counsel.[9] [See CV Doc. 1]. As such, Petitioner has failed to show cause for the procedural default of his prosecutorial misconduct claims. These claims are subject to dismissal on that ground alone. See Jackson v. United States, 638 F.Supp.2d 514, 601 (W.D.N.C. 2009). They also fail on the merits.

### 2.    Merits

To establish prosecutorial misconduct, a defendant must demonstrate: (1) that the conduct of the prosecutor was improper, and (2) that the improper conduct prejudicially affected his substantial rights so as to deprive him of a fair trial. See United State v. Mitchell, 1 F.3d 235, 240 (4th Cir. 1993). As noted, pursuant to Brady and Giglio, the United States has a duty to disclose favorable evidence, including impeachment evidence, that is material to guilt or punishment. Evidence is material if it creates "a reasonable probability of a different result." Kyles v. Whitley, 514 U.S. 419, 434 (1995) (internal quotation omitted).

Petitioner claims that the Government withheld text messages from S.M. that were material to the case. [CV Doc. 1 at 4]. Petitioner argues that these text messages show that S.M. staged a fake drug deal and stole police funds, which calls her reliability into question. [Id.]. Petitioner's claim is incorrect and presumably based on Petitioner's misunderstanding of Jenkin's full testimony on the subject. Jenkins mistakenly testified that he had seen certain text messages by S.M. regarding the rock salt buy. [CR Doc. 121 at 107-08]. After a sidebar in which Thorsen expressed concern over not having seen these test messages, Thorsen further cross-examined

---

[9] In his motion to amend, Petitioner purports to assert claims of ineffective assistance of his appellate counsel. [See CV Doc. 8 at 60-70]. These claims in substance, however, take issue with the Fourth Circuit's decision on Petitioner's appeal, not with the performance of appellate counsel. Moreover, in his motion to amend, Petitioner does not claim ineffective assistance of appellate counsel for failing to raise issues of prosecutorial misconduct. [See id. at 60].

Jenkins. On re-cross, Jenkins realized his mistake and testified that there were no such messages, but rather he had seen that information "in writing" in Barringer's report on the interview with Petitioner. [Id. at 108-111]. The Government produced all of the photographs of S.M.'s text messages and investigators did not subpoena phone records given the frequency with which individuals involved in the drug trade change their phones and use burner or pre-paid phones. [Id. at 60, 77, 102-03, 109, 110-11]. As such, there was nothing further to produce to Petitioner. Moreover, Petitioner has not shown that any alleged messages would have created a reasonable possibility of a different result, particularly where his theory that S.M. had pocketed the money from the rock salt deal was presented at trial [Id. at 17, 107, 223-24], he was not convicted of the drug conspiracy charge, and there were other witnesses to the controlled buy for which he was convicted. The Court will dismiss this claim.

Petitioner also asserts that the Government's decision not to call S.M. as a witness constituted prosecutorial misconduct. This claim is misplaced. There is no requirement to call a confidential informant to testify at trial. Furthermore, Petitioner could have called S.M. as a witness if he thought that her testimony would have assisted his defense. He did not. Petitioner's remaining allegations of prosecutorial misconduct are also conclusory and without merit. Petitioner identifies no false testimony or evidence that was presented at trial or sentencing, other than his unsupported claims in his motion to amend that the text messages were altered by the Government. [See, e.g., CV Doc. 8 at 25, 31-33]. Petitioner's mere denial of having committed the crime with which he is tried (and found guilty) does not establish that the evidence against him was false. Cf. United States v. Griley, 814 F.2d 967, 971 (4th Cir. 1987) ("A defendant seeking to vacate a conviction based on perjured testimony must show that the testimony was, indeed, perjured."). Furthermore, Petitioner fails to explain how the Government allegedly "violated" the

stipulation agreement. [CV Doc. 1 at 5]. Petitioner admitted that the substance seized on October 11 was methamphetamine and the Government relied on this stipulation. Petitioner has not shown improper conduct by the Government or prejudice on this issue.

The Court will, therefore, dismiss these claims.

### D. Due Process Violations by Trial Court

Petitioner claims that this Court "violated [his] due process" at trial by failing to inquire into the competency of Petitioner's counsel when counsel expressed uncertainty on the Rules of Criminal Procedure and for failing "to address the Jury or erras [*sic*] in the indictment." [CV Doc. 1 at 7]. First, Petitioner did not raise these claims on direct appeal, and he has not shown cause for this failure. They are, therefore, procedurally defaulted. See Bousley, 523 U.S. at 621-22, 118 S. Ct. at 1610-11.

This claim also lacks merit. Counsel's uncertainty regarding whether he needed to move for a mistrial to preserve evidentiary objections did not establish grounds for the Court to inquire as to counsel's competency. It is clear from the trial transcript that counsel moved for a mistrial out of an abundance of caution. [See CV Doc. 121 at 174-75]. Further, Petitioner's attorney was an experienced member of the CJA panel whose representation of Petitioner yielded an acquittal of the drug trafficking charge and the § 924(c) offense, which would have carried a mandatory consecutive sentence. There was no basis for the Court to inquire as to counsel's competency.

Finally, Petitioner identifies no errors in the Indictment that the Court should have advised the jury of and the Court sees none. This claim will be dismissed as conclusory and without merit. See Dyess, 730 F.3d at 359-60.

In sum, the Court will deny and dismiss Petitioner's § 2255 motion and grant the Government's motion to dismiss. The Court will deny Petitioner's "Motion Requesting Mercy"

as moot and Petitioner's motion to amend for the reasons state in this Order. The Court will also deny Petitioner's "Motion Requesting Discovery" for the same reasons that the Court denies Petitioner's claim of ineffective assistance of counsel for failure to request <u>Brady</u> and Jencks material and Petitioner's claim of prosecutorial misconduct for withholding <u>Brady</u> and <u>Giglio</u> material.

## IV. CONCLUSION

For the foregoing reasons, the Court denies and dismisses Petitioner's Section 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 [Doc. 1] is **DENIED** and **DISMISSED**.

2. Petitioner's Motion Requesting Mercy [Doc. 3] is **DENIED**.

3. The Government's Motion to Dismiss [Doc. 6] is **GRANTED**.

4. Petitioner's Motion for Discovery [Doc. 7] is **DENIED**.

5. Petitioner's Motion to Amend [Doc. 8] is **DENIED**.

6. **IT IS FURTHER ORDERED** that pursuant to Rule 11(a) of the Rules Governing Section 2254 and Section 2255 Cases, this Court declines to issue a certificate of appealability. <u>See</u> 28 U.S.C. § 2253(c)(2); <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 338 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong); <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000) (when relief is denied on procedural grounds, a petitioner must establish both that the dispositive procedural ruling is debatable and that the petition states a debatable claim of the denial of a constitutional right).

28

**IT IS SO ORDERED**.

Signed: January 15, 2021

Kenneth D. Bell
United States District Judge